Argued May 24; affirmed July 14, 1938

# LORENZ ET AL. *v.* PILSENER BREWING CO. OF OREGON ET AL.

(81 P. (2d) 104)

Department 1.

*Robert R. Rankin*, of Portland (Wood, Matthiessen & Rankin and Arthur P. Ireland, all of Portland, on the brief), for appellants.

*Herbert L. Swett*, of Portland (Simon, Gearin, Humphreys & Freed, Dey, Hampson & Nelson, R. R. Morris, and C. C. Carlson, all of Portland, on the brief), for respondents.

ROSSMAN, J. This is an appeal by the plaintiffs, two in number, who are a firm of building contractors known as Lorenz Bros., from a decree of the circuit

court which holds invalid a mechanic's and material-man's lien claim, filed by them April 23, 1934, against real property owned by the defendant-respondent, Northwest Real Estate & Investment Company. The amount claimed is $19,868.56, an alleged balance. The property described in the lien claim consists of two lots improved with a two-story-and-basement structure, 100 by 95 feet in size, located at the northeast corner of Northwest Second Avenue and Couch street in Portland, together with adjacent space 15 feet in width directly to the east of that property. All of this property is owned by the defendant Northwest Real Estate & Investment Company, to which we shall hereafter refer as the defendant. By a lease, dated September 15, 1933, it was demised for a 10-year term to the other defendant, Pilsener Brewing Company of Oregon, now insolvent, which has not appealed. The plaintiffs contend that their last construction work upon this property was performed by them February 23, 1934. Therefore, if this is true, the lien was filed on the 59th day after completion of the work. They claim that they were original contractors within the meaning of § 51-105, Oregon Code 1930, which provides that an original contractor may file his lien notice within 60 days after completion of his undertaking. They admit that they gave no notice of the kind described in § 51-101, which says:

"Every person, firm or corporation furnishing material or supplies of any kind to be used in the construction, alteration or repair, either in whole or in part, of any building * * * shall not later than five days after the date of the first delivery, to any contractor or agent, of such material or supplies for which a lien may be claimed, deliver or mail to the owner or reputed owner of the property * * * a notice in writing * * *."

Since the plaintiffs contend that they were original contractors, they argue that it was unnecessary for them to send the five-day notice. The defendant denies that the plaintiffs performed any work whatever for it, and contends that if the aforementioned lease authorized the performance of any work, it contemplated that the lessee should become the contractor and the plaintiffs subcontractors. Therefore, the defendant argues that, under § 51-105, the plaintiffs had only 30 days in which to file their lien claim and were required to mail a five-day notice after they began to furnish materials and supplies. The defendant admits that it had knowledge of the work being done by the plaintiffs and that it did not post the notice of nonliability described in § 51-104.

The evidence indicates that in September of 1933 some of the officers of the Pilsener Brewing Company of Seattle, a Washington corporation, desired to form an Oregon corporation bearing the trade name "Pilsener" and to establish a brewing plant for it in Portland. The plaintiffs became interested in this venture, and Max Lorenz, one of the two, undertook to find a suitable location for the proposed Portland plant. Finally, he and H. R. Fischnaller, president of the Seattle company, selected the defendant's property above mentioned. A few days later, that is, on September 11, 1933, the Pilsener Brewing Company of Oregon, now one of the two defendants, was organized, and the plaintiffs subscribed for some of its stock. That having been done, Max Lorenz was elected a director and vice-president of the new corporation, and Fischnaller was made its president. In December, 1933, the other plaintiff, Walter Lorenz, was also elected a director of the new corporation, and Max Lorenz became general manager.

September 15, 1933, the new corporation, as lessee, and the defendant, as lessor, subscribed to a lease which demised to the lessee the aforementioned real property for a term of 10 years. The rental for the first five years was fixed at $200 per month, and for the remaining five years its amount was subject to adjustment by arbitrators. The following is quoted from the lease:

"* * * it being the intention of said Lessee to use said premises for a brewery; that at the expiration of the said term or upon any sooner determination of this lease, it will quit and deliver up the premises and all future erections or additions to or upon the same, to the said Lessor, or those having its estate therein, peaceably, quietly and in as good order and condition (reasonable use and wearing thereof, fire and other unavoidable casualties excepted) as the same now are or may be put in by the Lessor, * * *

"It is understood and agreed by the parties hereto that to enable the Lessee to conveniently use and occupy the premises hereby leased certain improvements and repairs to the building are required, and to make these repairs and improvements the Lessor will advance to the Lessee the sum of Nine Thousand Dollars ($9,-000.00), to be expended on the building, such improvements and repairs to be made under the direction of and by Lorenz Bros. Building Contractors, to whom said $9,000.00 shall be paid as required for the purpose aforesaid; provided, however, that if said sum of $9,000.00 be insufficient to make the improvements and repairs required, the additional moneys required shall be advanced by and for account of the Lessee. And in consideration of said advance and expenditure of $9,000.00 by the Lessor for the purpose aforesaid, the Lessee hereby covenants and agrees to reimburse and refund to the Lessor said sum of $9,000.00, with interest, in monthly installments of One Hundred Seventy-four Dollars ($174.00) each, during a period of five (5) years commencing November 1, 1933, and a like sum of $174.00 to be paid to the Lessor each month during said period of five (5) years.

"The Lessee during the term of this lease will at its own expense keep the building, both inside and outside, in good tenantable order and repair.    *    *    *

"It is further understood and agreed by the parties hereto that the Lessor shall have a lien for the herein stipulated rent as well as the $9,000.00 to be expended for improvements and repairs to the building, upon the plant, machinery, implements, fixtures and other effects that the Lessee may install in said building to enable it to carry on its business, and such lien hereby created and established may be enforced on the nonpayment of any installment of rent or nonpayment of the monthly installments on the $9,000.00 refund aforesaid, the enforcement of such lien to be made as in the case of chattel mortgage in default.    *    *    *"

In the consummation of this lease Max Lorenz was the chief spokesman for those who contemplated the formation of the new corporation, although he swore that he acted under instructions from Fischnaller. It was he who agreed with the representatives of the defendant that the monthly rental for the first five-year term should be $200 a month. He also induced the defendant to agree to advance $9,000 towards payment of the alteration and repair charges.

On the day the lease was executed the Oregon Pilsener Company, as party of the first part, and the Washington Pilsener Company, as party of the second part, executed an agreement which, after reciting that the Oregon Company contemplated the issuance of 10,000 shares of common stock and debenture notes in the amount of $75,000, stated:

"WHEREAS, the second party is now engaged in the brewery business in the city of Seattle, Washington, and has the capital and knowledge and experience making it possible for it to install a brewery in the city of Portland, Oregon, and it is the desire of the parties that the second party shall install a brewery of the type and

size hereinafter described for the first party, and that said brewery will be installed on the property hereinafter described,

"Now, THEREFORE, in consideration of the mutual agreements between the parties, it is agreed as follows:
* * *"

The instrument then bound the Oregon corporation (1) to sign the aforementioned lease; (2) to issue to the Washington corporation 9,000 of its 10,000 shares of stock; (3) to execute a debenture agreement with the Title & Trust Company of Portland whereby the Oregon corporation would bind itself to deposit with the trustee just mentioned 50 cents for each barrel of beer sold, thus creating a sinking fund for the eventual retirement of the debentures; and (4) to deliver the debentures to the Washington corporation. By this agreement the Washington corporation bound itself (1) to guarantee the Oregon corporation's faithful compliance with the covenants of the lease; (2) "that on or before January 1, 1934, it will make such necessary changes and alterations in the building above described as will be required to convert it into a brewery of sufficient size to produce two hundred (200) thirty-one (31) gallon barrels of beer per day. The second party agrees further to install in said building the necessary machinery and equipment, including manufacturing equipment, fermenting vats, storage vats, racking room equipment, office equipment and supplies, cooperate, and any other necessary equipment for the production of two hundred (200) thirty-one (31) gallon barrels of beer ready for commercial sale. (It is understood that installation of a bottling works will not necessarily be required.) Second party agrees and guarantees that on the above-mentioned date all of said machinery and equipment of every kind and nature will be free of any claim or indebtedness of any

kind, and that the title to all of the property installed in said premises shall immediately vest in the first party upon its installation." (3) to grant the Oregon corporation a license for the use of the Pilsener label and trade-mark; and (4) to secure from the federal government a permit for the manufacture and sale of beer upon the leased premises.

Subscribed to the lease is a guarantee by the Washington corporation of the Oregon corporation's compliance with its covenants. The evidence indicates that the Oregon corporation delivered to the parent corporation a certificate for 9,000 shares of its capital stock and that the debentures were issued in the manner required by the contract just reviewed.

The building aforementioned had been used for many years as a garment factory, but in the two-year period immediately preceding the execution of the lease it was vacant. However, the structure was still usable for manufacturing purposes and was likewise adapted for use as a warehouse. For either of these purposes only minor repairs would have been necessary.

Shortly after the aforementioned contract and lease had been executed the plaintiffs proceeded with alterations and repairs upon the structure. It is agreed that the defendant was not the one who asked that the plaintiffs be named in the lease as the firm which should perform the work. Max Lorenz testified that it was Fischnaller who insisted that the plaintiffs' name be inserted in the lease. Certainly, the plaintiffs were not averse to the undertaking. They had a two-fold interest—first, they desired to earn a profit as contractors in making the repairs and alterations, and, second, since they were stockholders in the new corporation they naturally desired that the work should be expedited so that their investment might begin to earn a profit.

The contract between the plaintiffs and the Pilsener Company was oral only. Since the Washington Pilsener Company had contracted with the Oregon concern to convert the structure into a brewery, the plaintiffs' contract for the actual performance of the work must have been with that concern. Max testified that it was agreed that the plaintiffs should perform the work upon a cost-plus-ten per cent basis. The defendant was not consulted concerning this contract, and apparently did not know of the contract between the two Pilsener companies. Max swore that when the plaintiffs began work the extent of the repairs and alterations had not been determined. At that time the plans were in a tentative form only, and the final ones were not drafted until after the work had commenced. No specifications were prepared. Max testified: "The authority came from two sources, one of them through the lease from the Northwest Real Estate & Investment Company and the other by oral agreement from the Pilsener Brewing Company." It will be observed that he said "Pilsener Brewing Company" without designating which one of the companies bearing that name he referred to. He also spoke of Fischnaller giving the plaintiffs instructions and supervising the work, but it will be recalled that Fischnaller was an officer of both companies. The plaintiffs make no contention that the defendant had any voice in the preparation of the plans nor in the direction of the work. They concede that none of the officers of the defendant ever saw the plans for the work, and admit that none of them even made a suggestion concerning operations. No reports were made to the defendant concerning the nature of the work, the amount being spent, or the cost of that which remained to be done. The engineering entailed in converting this building into a brewery was

planned by Frank Koetter, an engineer, and the drafting was done by Joseph W. Heiler. Both of these men were selected by Fischnaller or some officer of the brewing companies. Max testified that he acted under directions of "both Mr. Fischnaller and Mr. Koetter". He swore that the former told him to follow Koetter's instructions and the plans which were submitted from time to time. We quote from his testimony: "Mr. Fischnaller came down periodically and looked over the work as we progressed with it, and Mr. Koetter, the representative of Mr. Fischnaller, was here practically all of the time during the construction of the work."

The changes in the building consisted of strengthening the first floor by placing additional supports in the basement. This work was necessitated by the fact that it was proposed to install large tanks upon the first floor. Additional alterations included repair of the roof, removal of the sprinkler system, placing a concrete coating over the first floor, touching up of the mortar joints on the exterior of the building, and the construction of partitions for a cooling room and offices.

While the work was in progress the attorney for the defendant visited the premises at least once. His visit was necessitated by the fact that the brewing company requested that some windows in an adjacent five-story structure owned by the defendant be bricked in. Officers of the defendant also made two or three visits to the property. No one contends that during the course of these visits the officers gave any directions concerning the work or interfered with the operations. Apparently, they merely desired to observe the condition of the structure.

The plaintiffs claimed that the alterations and repairs cost $45,503.96 and that payments and credits upon the account reduced this sum to an unpaid balance of $19,868.56, being the amount for which the lien is claimed. Included in the credits is the sum of $9,000 paid by the defendant, pursuant to the provision of the lease above quoted. Although he was contradicted by other witnesses, Max swore that this $9,000 was not intended to cover the full cost of performing the repair and alteration work. He testified that Fischnaller had requested him to ask the defendant for an advance of that amount of money towards defraying the expenses of the repairs and alterations. He himself referred to it as "an advancement on the work to be done," and claimed that he did not know how Fischnaller had come to select $9,000 as the needed sum. On October 16, 1933, when the plaintiffs asked the defendant for $6,000 to apply on "work completed" payment was promptly made. Fourteen days later demand was made for payment of the balance, $3,000, "on account of alterations" and a further check in that sum was promptly sent. The plaintiffs carried the account in their ledger under the title of "Pilsener Brewing Company of Oregon." It will be observed that this entry makes no mention of either the defendant or the Washington corporation, but Max testified that the ledger entry was merely intended to identify the job and not to include all of those to whom the firm looked for payment.

The defendant claims that the work performed by the plaintiffs has not increased the value of its structure, but that it has converted the building from its general adaptation to a special purpose structure. Its witnesses pointed out that the many posts in the basement deprive that portion of the structure from use-

fulness for storage purposes because trucks cannot be run between the posts. One of the witnesses thought that the weight of the concrete floor would render it unsafe to remove any of the posts. The plaintiffs' removal of the sprinkler system from the building increased the insurance rate, and it seems that the assessed value of the structure for taxation purposes has been slightly increased.

The above, we believe is a sufficient summary of the evidence.

In *Oregon Lumber & Fuel Co. v. Nolan*, 75 Or. 69 (143 P. 935, 146 P. 474), the facts were: The defendant Nolan who owned a lot in the city of Portland, entered into an agreement with one Blanchard, which besides giving the latter an option to purchase the property, stated: "The said Nolan does hereby lease and let unto the said Blanchard * * * for a term of 15 years from the date hereof all of the following * * *. The said Blanchard shall construct a substantial rooming, boarding or apartment house building upon said property at a cost of not less than $6,000. Construction of said building shall be commenced within a reasonable time and shall be completed within four months from the date hereof. At the expiration or termination of this lease all buildings or other improvements which may be erected upon the said land during the life of this contract, shall immediately revert to the land and the title thereto shall become immediately vested in the said Nolan * * *." The agreement bound Blanchard to protect the property against liens. The day following the commencement of construction Nolan posted a notice of nonliability. Before Blanchard had completed construction he became insolvent. The plaintiff was a materialman's lien claimant and was the assignee of other liens. Nolan's principal defense

was based upon his posted notice of nonliability. The circuit court's decree was in favor of some of the lien claimants. In sustaining that decision, the opinion of this court stated:

"In the view we take of the question involved, however, it is not material to inquire whether Nolan posted a notice or not. The terms of the contract between himself and Blanchard required the latter without any choice on his part to construct a building. Although this stipulation was coupled with a lease and an option to purchase the premises, yet its legal effect is to make Blanchard a contractor for the erection of a building. * * * These conditions made Blanchard the statutory agent of Nolan within the scope of Section 7416, L. O. L., so that one furnishing material or labor at the instance of such an agent for the erection of a building would be entitled to a lien on the realty on which it was situated if Nolan owned the fee. Under such circumstances the law imposed upon Nolan's property certain obligations to those who should furnish materials for the erection of the house at the instance of his statutory agent. Laborers and materialmen, covenanting with Blanchard, either directly or through subcontractors, have rights in the premises arising by operation of law which Nolan and Blanchard cannot destroy by contract between themselves. * * * If Blanchard had been only a tenant of the premises, without obligation on his part to erect a building, and under such circumstances had contracted for the erection of the structure, only his leasehold estate would have been primarily liable under Section 7417, L. O. L., for the materials and labor furnished. Yet even then the fee owned by Nolan also would have been liable under Section 7419, if he knew of the work, unless he had given the notice mentioned therein, and this because there would then have been no contract to which Nolan was a party contemplating the compulsory erection of the building. This is in accordance with the principle, so often announced by this court, that to support a lien there must be some contractual relation, either directly

or indirectly between the lien claimants and the holder of the realty interest sought to be charged. Here, however, Nolan himself has in unmistakable terms directly made an agreement with his contractor Blanchard to build the house. He holds out Blanchard to the world as the person having charge of the construction of a building on Nolan's land. He cannot repudiate any of the terms or conditions which the law itself visits upon such a convention for the benefit of persons named in the statute. The distinction between cases where improvements are at the option of a tenant or mere acquiescence of the landlord, entailing no right to a lien when proper notices are given, and the other class of cases where the improvement is compulsory on the part of the tenant making him a contractor with the landlord, with the consequence that liens may be claimed against the fee for materials or labor furnished, is clearly pointed out by  *  *  *.  Under our statute the principle seems to be that if the owner of the fee contracts with his tenant or would be purchaser, compelling the latter to erect a building, an agency is created as against the owner of the fee by force of the statute, with the result that one who furnishes material or labor at the instance of the agent is entitled to a lien on the fee for the labor or materials furnished. Such is the situation presented in this case and the same is controlled by the provisions of Section 7416 L. O. L.''

Notwithstanding plaintiffs' contention, we do not believe that our later decisions *Myers v. Strowbridge Estate Co.*, 82 Or. 29 (160 P. 135) ; *Nicolai-Neppach Co. v. Poore*, 120 Or. 163 (251 P. 268), have departed from *Oregon Lumber & Fuel Co. v. Nolan*, supra. It is true that when those decisions mentioned a lessee, holding under a lease containing a compulsory clause for the improvement of the property, they spoke of him as the agent of his lessor without the use of the qualifying word "statutory," but both decisions cited with approval *Oregon Lumber & Fuel Co. v. Nolan*, supra, and we believe that it is evident that they meant statutory

agent. The annotation in 79 A. L. R. 962 reviews many decisions in harmony with *Oregon Lumber & Fuel Co. v. Nolan.*

■ The decision just reviewed affords evidence of careful preparation. It has stood unchallenged for twenty-three years, and is authority for the proposition that a tenant who is under a contractual duty to improve the property becomes a "contractor for the erection of the building" and is the "statutory agent" of his lessor. That being true, those who deal with him become subcontractors, materialmen, etc., who are required to file their lien claims within 30 days' time, and give the owner notice of their delivery of material and of their intention to look to the property as security for payment. The owner is not personally liable to them.

■ In the present instance, the lessee was under no contractual obligation to make any alterations or repairs. It is true, as the lease recites, that changes were "required" to convert the structure into a brewery, but nevertheless the lessee was under no contractual duty to make them. It could have used the building as a warehouse or could have permitted it to remain vacant without breaching any covenant of the lease. The record contains no indication that the defendant desired any alterations to the building. It agreed to contribute nothing to their cost either in a lump sum or by way of reduced rentals. The $9,000 mentioned in the lease was a loan, no different in character than if a third party had made it. Its repayment was required and was secured by a lien upon the brewing equipment which the lessee proposed to install in the structure. The rent was fixed at $200 per month for the first half of the term and was not preceded by any suggestion that the alterations would be of sufficient value to the re-

version that they ought to be taken into consideration in determining the amount of the rent. For the last five years of the term the lease states that the rent should not be less than $200 per month, and that its exact amount should be determined by arbitrators if the parties were unable to agree. Had the parties deemed the alterations and repairs of value to the reversion, or had a lower rent been granted because of them, certainly, the lease would not have rendered them permissive but compulsory. In our opinion, it is clear that the lessee was under no contractual obligation to make any alterations or repairs and that, therefore, it was neither a contractor within the contemplation of our mechanic's lien statutes nor the statutory agent of the defendant. The plaintiffs did not sign the lease and entered into no contractual relationship with the defendant. The lease was not executed for their benefit.

■ But the plaintiffs contend that the lessor and the lessee were joint proprietors or joint principals in carrying out this work, and that, therefore, the plaintiffs were original contractors. They cite *McNulty Bros. v. Offerman*, 221 N. Y. 98 (116 N. E. 775); *P. Grassi & Bros., Inc., v. Lovisa & Pistoresi, Inc., et al.*, 259 N. Y. 417 (182 N. E. 68, 83 A. L. R. 1149), and *Boyer v. Keller*, 258 Ill. 106 (101 N. E. 237, Ann. Cas. 1916B, 628). For the following reasons we believe that this contention cannot be sustained: (1) The lessee was under no contractual duty to make any changes to the property; (2) our above-cited decisions deem an occupant, whether a vendee or a lessee, under contractual duty to improve the property, not as a joint principal but as a contractor or statutory agent of his lessor; (3) neither the plaintiffs nor the lessee deemed the latter a joint principal as is evidenced by the fact that the lessee, without consulting the defendant, con-

tracted with its parent concern for the conversion of this structure into a brewery, and in the same contract surrendered control over itself to the parent concern; and (4) the plaintiffs accepted their contract, not from the lessee, but from the Washington corporation.

■■ The plaintiffs argue that since the defendant had knowledge of the work which was being performed upon its structure, it was unnecessary for them to send to the defendant the five-day notice described in § 51-101, Oregon Code 1930. It is true that the defendant was aware that work was in progress, but it had no notice that the plaintiffs would claim a lien upon the property; to the contrary, the record contains evidence that the plaintiffs never thought of filing a lien, and induced in the officers of the defendant a belief that the property would be free and clear of liens when the work was completed. *Edmiston v. Kiersted*, 140 Or. 299 (12 P. (2d) 299), construes § 51-101 as meaning that compliance with it is essential to the perfection of the lien. Knowledge on the part of the owner that deliveries of building materials are being made does not, according to that decision, eliminate necessity for sending to the owner notice of such deliveries and that a lien will be claimed unless payment is made.

■ Therefore, since the plaintiffs failed to file their lien claims within 30 days, and likewise failed to give notice to the owner within five days from the time they began to bring construction materials upon the premises, their lien claim must be deemed invalid.

The decree of the circuit court is affirmed.

BEAN, C. J., and KELLY and BELT, JJ., concur.